UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.

TILMAN WILLIAMS,

      Defendant.

_____/

Case No. 14-cr-20419
Hon. Matthew F. Leitman

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND DISMISS INDICTMENT (ECF #17)

Defendant Tilman Williams chose to decorate his apartment with sexually explicit photographs of young girls. In doing so, he assumed serious risks. One such risk: if he had a medical emergency and allowed first responders into his apartment to render aid, they might discover the photographs and notify the police. And that is exactly what happened.

The police eventually obtained a warrant to search Williams' apartment, and they seized the photographs and other evidence. A federal grand jury later indicted Williams on two counts of receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2) and two counts of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). (*See* the "Indictment," ECF #12.)

Williams has moved to suppress the evidence seized from his apartment and to dismiss the Indictment. (*See* the "Motion," ECF #17.) Williams raises two

1

challenges to the seizure of the photographs and other evidence. First, Williams argues that the affidavit supporting the search warrant was tainted because it contained information the police unlawfully obtained during an earlier warrantless search of his apartment. Second, Williams contends that the affidavit supporting the search warrant failed to establish probable cause to believe that he committed any criminal offense.

The Court declines to suppress the evidence seized from Williams' apartment. It is far from clear that the warrantless entry about which Williams complains violated the Fourth Amendment, and, even if it did, the conduct of the police was not sufficiently culpable to warrant the exclusion of the evidence they eventually seized pursuant to the warrant. Moreover, the affidavit supporting the search warrant did establish probable cause to believe that Williams unlawfully possessed child pornography, and the police acted in good faith in relying upon the affidavit and warrant. Accordingly, the Court **DENIES** Williams' Motion.

## FACTUAL BACKGROUND

The Court held evidentiary hearings on Williams' Motion on October 9 and October 24, 2014.[1] Based on evidence presented at the hearings, the Court now finds the relevant facts as follows:

---

[1] Williams was present for, but did not testify at, the evidentiary hearings.

1. Williams lives alone in a one-bedroom apartment at the Village Park Apartments in Southgate, Michigan. (*See id.* at 20-22, Pg. ID 156-58.)[2]

2. Williams suffers from several health conditions for which he takes certain prescription medications. (*See* Oct. 9 Tr., ECF #23 at 25, Pg. ID 161.)

3. At all times relevant here, Williams' apartment was in an "extreme hoarding" state. (Oct. 24 Tr., ECF #22 at 9, 16; Pg. ID 98, 105.)

4. Photographs of Williams' apartment depict large piles of garbage stacked on nearly every surface. (*See* Govt. Ex. 1, 2, and 4.) In the photographs, empty soda bottles and milk containers are spilling out of the sink onto the kitchen floor. Boxes of food – primarily Hot Pockets and Little Debbie snack cakes – are strewn about the kitchen. Piles of overstuffed white garbage bags in the living room reach almost to the ceiling. Throughout the entire apartment, there appears to be virtually no open space in which to walk.

5. Williams' apartment was virtually uninhabitable.

6. There was another distinguishing feature of Williams' apartment: the prominent display of child pornography and sexually-suggestive material as décor elements.

7. On the walls in the bedroom, Williams displayed photographs of girls estimated to be between the ages of 8 and 12 exposing their genitalia in a sexually suggestive manner and engaged in explicit sexual acts. (*See* Oct. 9 Tr. at 27-28, 39-40, 65; Pg. ID 163-64, 175-76, 201.)

8. In plain view in the living room, Williams displayed framed photographs of young girls in various stages of undress. (*See id.* at 64, Pg. ID 200. *See also* Oct. 24 Tr. at 16, Pg. ID 105.)

9. Early in the morning of January 4, 2013, Williams slipped and fell on soda bottles strewn about the floor of his living room. (*See* Oct. 9 Tr. at 25, Pg. ID 161.)

---

[2] The Court provides supporting citations as examples of material in the record that supports the Court's findings. By giving a specific citation, the Court does not mean to imply that the cited evidence is the sole support in the record for a particular finding. The Court's findings are based upon the totality of the evidence presented at the two evidentiary hearings.

3

10. Williams was injured as a result of the fall and was unable to stand up by himself.  (*See id.* at 22, Pg. ID 158.)

11. One of Williams' neighbors at the Village Park Apartments called 911 to report Williams' accident.  (*See id.* at 20, Pg. ID 156.)

12. Jason Ferrell ("Ferrell") and Matthew Sisty ("Sisty"), paramedics for Community EMS ("CEMS") – a private, non-profit organization that contracts with local governments to provide emergency medical services – responded to the 911 call.  (*See id.* at 14, 20; Pg. ID 150, 156.)  Two members of the Southgate Fire Department ("SFD") also responded to the call.  (*See id.* at 20, Pg. ID 156.)

13. Ferrell, Sisty, and the SFD personnel (collectively, the "Initial Responders") arrived at Williams' apartment at approximately 5:30 a.m. on January 4, 2013.  (*See id.*)

14. The front door to Williams' apartment was chained, and Williams was unable to reach the door to unlock it.  (*See id.* at 21-22, Pg. ID 157-58.)

15. Williams gave the Initial Responders permission to cut the chain in order to enter the apartment and attend to his medical needs.  (*See id.*)

16. Upon entering the apartment, Ferrell found Williams lying on the floor in the living room.  (*See id.* at 22, Pg. ID 158.)

17. Ferrell immediately noticed that the apartment was a "hoarder house," with "food debris, clothes, [and] other various items … all over the apartment" in piles four-to-five feet high.  (*Id.* at 22-23, Pg. ID 158-59.)

18. Ferrell approached Williams and began to render first aid.  (*See id.* at 24, Pg. ID 160.)  Ferrell found that Williams' blood pressure was elevated, and Williams was having difficulty breathing.  (*See id.*)

19. Ferrell then asked Williams whether he took any medications.  (*See id.*)  Ferrell needed to know which medications Williams was taking in order to (a) properly assess Williams' condition, (b) determine an appropriate course of emergency medical treatment, and (c) provide full information to physicians in the event that he transported Williams to the hospital. (*See id.* at 26-27, Pg. ID 162-63.)

20. Williams told Ferrell that he did take medications, but he could not remember their names. (*See id.* at 25, Pg. ID 161.)

21. Williams told Ferrell that the medications were in his bedroom. (*See id.*)

22. Ferrell then entered the bedroom for two reasons: to locate Williams' medications and to observe the living conditions so that he could file a report with the Department of Human Services detailing the hoarding conditions. (*See id.* at 16-18, 26; Pg. ID 152-54, 162.)

23. Williams did not tell Ferrell not to enter the bedroom. (*See id.* at 27, Pg. ID 163.)

24. Upon opening the bedroom door (which had been closed up until this point), Ferrell saw that the bedroom was "like the rest of the house, a hoarder house." (*Id.*)

25. Ferrell also observed on the bedroom walls the photographs described above depicting young naked girls. (*See id.*) Some of the girls appeared to be prepubescent, and others appeared to be teenagers under the age of 15. (*See id.*) One picture appeared to depict a prepubescent girl having sex with a man. (*See id.* at 27-28, Pg. ID 163-64.)

26. Ferrell immediately called one of the SFD representatives into the bedroom and asked him to telephone the police. (*See id.* at 30, Pg. ID 166.)

27. Thereafter, the Southgate Police Department dispatched Officer John Veldhuis ("Veldhuis") to Williams' apartment. (*See id.* at 59, Pg. ID 195.)

28. The dispatcher instructed Veldhuis to meet CEMS personnel who were at the apartment to treat a slip-and-fall victim. (*See id.*) Accordingly, Veldhuis thought that he was responding to "an ongoing medical emergency." (Oct. 24 Tr. at 22, Pg. ID 111.)

29. Veldhuis met Ferrell outside of Williams' apartment. (*See id.* at 8, Pg. ID 97.)

30. Ferrell told Veldhuis that CEMS had been sent to the apartment on a "rescue run" and discovered an "extreme hoarding" situation. (*Id.* at 9, Pg. ID 98.) Ferrell further explained that the living condition were "untenable."

(*Id.* at 8, Pg. ID 97.)   Finally, Ferrell told Veldhuis that he thought there might be child pornography in the apartment.  (*See id.*)

31. Based on Ferrell's description of the apartment as an "extreme hoarding" situation, Veldhuis was concerned for the safety of the Initial Responders, Williams, and anyone else who might have been in the apartment.  (*See id.* at 12, Pg. ID 101.)   Veldhuis was also concerned about the safety of the individuals in the neighboring apartments.  (*See id.*)   Veldhuis understood that extreme hoarding could pose a threat to occupants of Williams' apartment and to his neighbors.  (*See id.* at 13, Pg. ID 102.)

32. Veldhuis decided to enter Williams' apartment.  He made that decision:

> because of the medical emergency that was ongoing at the time, which was why [he] was originally sent there, and then for the safety, to determine the safety of the situation…. [Veldhuis] didn't know at the time whether the person that was being medically treated, if they were going to go to the hospital, if they were going to stay, then [he] needed to assess whether it was safe for them to stay or not.  If there were children, [he] needed to see if it was a safe condition for them to be in, if the building was a danger, if the apartment was a danger to neighboring apartments on either side, on top of or below, as it is an older apartment building.

(*Id.*)[3]

33. The possible presence of child pornography in Williams' apartment played only a *de minimis* role, if any, in Veldhuis' decision to enter Williams' apartment.   Although Veldhuis was aware that the apartment contained suspected child pornography before he entered, his "overriding concern" that led to his entry "was safety and security."  (*Id.* at 14, Pg. ID 103.) Given the reported condition of the apartment, Veldhuis believed that "it would have been a dereliction of [his] duty to not go in."  (*Id.* at 15, Pg. ID 104.)

---

[3]  The block quote above is an excerpt from Veldhuis' testimony.  The Court finds that testimony – and all of Veldhuis' testimony – to be credible.

34. Veldhuis did not enter the apartment in order to gather information to support a later request for a warrant to search for and seize suspected child pornography. On the contrary, Veldhuis believed that Ferrell's description of the suspected child pornography, standing alone, was sufficient to support a request for a search warrant. (*See* Oct. 9 Tr. at 71, Pg. ID 207.)

35. When Veldhuis went to enter the apartment, the door was open. (*See id.* at 73, Pg. ID 209.) Veldhuis walked in and stood in the entryway. (*See id.* at 63-64, Pg. ID 199-200.) From that vantage point, Veldhuis noticed that the living room was in a hoarding state. (*See id.* at 64, Pg. ID 200.) Veldhuis considered the hoarding to be "extreme," and the condition of the apartment seriously concerned him. (Oct. 24 Tr. at 16, Pg. ID 105. *See also* Oct. 9 Tr. at 64, Pg. ID 200.)

36. While still standing in the entryway, Veldhuis was also able to see, in plain view in the living room, "stacks of framed pictures … of young girls in [various stages of] undress." (Oct. 24 Tr. at 16-17, Pg. ID 105-06.) From the entryway, Veldhuis could also see into the bedroom (the door to which had been left open by Ferrell), where he noticed "framed color pictures of child pornography and [children] engaged in explicit sexual acts." (Oct. 9 Tr. at 64-65, Pg. ID 200-01.)

37. Veldhuis found Williams seated on the couch in the living room. (*See id*. at 63, Pg. ID 199.) Veldhuis asked Williams a series of questions designed to elicit information that would allow Veldhuis "to get into contact with a family member regarding [Williams'] medical condition." (*See* Oct. 24 Tr. at 15, Pg. ID 104.) Veldhuis wanted to determine "if there was somebody, if [Williams] did not go to the hospital, that I could have – maybe take him somewhere that would be a safer condition." (Oct. 9 Tr. at 67, Pg. ID 203.)

38. When Veldhuis spoke with Williams, Veldhuis was "concerned about the state in which Mr. Williams was living at that point." (*Id.*)

39. During this conversation, Williams did not tell Veldhuis to leave the apartment. (*See id.* at 63, 68; Pg. ID 199, 204.) Williams never told Veldhuis not to enter the apartment, nor did Williams ever ask Veldhuis to leave. (*See id.*)

40. After Veldhuis' initial conversation with Williams, Veldhuis entered the bedroom "to see if it was safe for [Williams] to stay there" if CEMS did not

7

take Williams to the hospital. (*Id.* at 66, Pg. ID 202.) Veldhuis needed to determine if "it was safe for [Williams] to stay there or if we needed to find other accommodations for him." (*Id.*)

41. Veldhuis observed "framed color[] pictures of child pornography" displayed on the walls in the bedroom. (*Id.* at 65, Pg. ID 201.) Some of the photographs depicted children "engaged in explicit sexual acts." (*Id.*) Veldhuis estimated that the children depicted in the photographs were between the ages of 8 and 12 years old. (*See id.*)

42. Veldhuis spent only a total of 5-10 minutes in Williams' apartment. (*See id.* at 68, Pg. ID 204.) Williams was transported to the hospital as Veldhuis was finishing his inspection of the apartment. (*See id.*)

43. After Williams had been taken out of his apartment on a stretcher, Veldhuis called his superior officer, Sergeant Chris Cassette ("Cassette"), exited the apartment, and stood in the hallway outside the apartment. (*See id.* at 68-69, Pg. ID 204-05.) Veldhuis told Cassette about the hoarding situation and the presence of child pornography. (*See* Oct. 9 Tr. at 68-69, Pg. ID 204-05.)

44. Thereafter, Southgate Police Department Detective Sergeant Matthew Flynn ("Flynn") arrived at the Village Park Apartments to assist Veldhuis. (*See* Oct. 24 Tr. at 29, Pg. ID 118.)

45. Veldhuis met Flynn outside of Williams' apartment. (*See id.*) Veldhuis did not re-enter the apartment after stepping into the hallway. (*See* Oct. 9 Tr. at 77, Pg. ID 213.) Flynn did not enter the apartment at that point.

46. While standing in the hallway, Veldhuis explained to Flynn that he (Veldhuis) had responded to a medical emergency. Veldhuis further explained that when he arrived at the apartment complex, Ferrell told him that he (Ferrell) had observed nude photographs of young girls inside Williams' apartment. (*See* Oct. 24 Tr. at 29, Pg. ID 118.)

47. Veldhuis also informed Flynn that he (Veldhuis) had observed the photographs. (*See id.*)

8

48. Flynn concluded that there was sufficient probable cause to seek a search warrant for Williams' apartment.  (*See id.* at 32-33, Pg. ID 121-22.)

49. Flynn did not enter Williams' apartment to view the pictures.  (*See id.* at 29, Pg. ID 118.)  Rather, Flynn returned to his office to seek a search warrant. (*See id.* at 31, Pg. ID 120.)

50. Flynn prepared an affidavit in support his request for a warrant.  In relevant part, it provided as follows:

> At approximately 6:25 a.m. on 1/14/2013, Affiant was contacted by the shift Lieutenant who advised a rescue had been dispatched to [redacted] Village Park Drive Apt #2070 on a male who had fallen and couldn't get up. Upon arrival, Southgate FD and Community EMS found the door unlocked, but chained.  The victim identified as Tilman Williams was down in the hallway and unable to open the door.  Southgate FD had to cut the chain so first aid could be rendered.
>
> Upon entry, Southgate FD and Community EMS found the living conditions to be very poor, and EMS paramedic Jason Ferrell entered the only bedroom looking for possible medications the victim may be taking.   Upon entering the only bedroom, [Ferrell] observed numerous pictures of young children specifically girls in the nude.   [Ferrell] immediately requested police assistance and Ofc John Veldhuis and Sgt Chris Cassette responded.
>
> Responding officers arrived while the victim was being treated and being prepared for transport.  They observed numerous pictures framed and unframed of nude female children, as well as children underwear in the only bedroom.  Numerous Barbie dolls undressed were also observed in sexual positions.   Responding officers believing this to be child pornography secured the apartment and contacted the detective bureau....

(The "Supporting Affidavit," ECF #20-2 at 2-3, Pg. ID 81-82.)

51. Flynn wanted to confirm that the Supporting Affidavit sufficiently established probable cause, so he faxed a copy of it to the Wayne County Prosecutor's Office for review by an assistant prosecuting attorney. (*See* Oct. 24 Tr. at 31-32, Pg. ID 120-21.)  The Wayne County Prosecutor's Office sent a return fax approving the Supporting Affidavit without modification. (*See id.*)

52. Flynn then submitted the Supporting Affidavit to a magistrate in Michigan's 20th District Court.  The magistrate issued a warrant authorizing the police to search Williams' apartment and seize "any photographs of nude children, any children['s] underwear[,] as well as any and all Barbie dolls," and computer equipment. (The "Search Warrant," ECF #20-2 at 4-5, Pg. ID 83-84.)

53. Officers from Southgate Police Department, including Flynn, executed the Search Warrant and seized numerous framed photographs, several photo albums, four naked Barbie dolls, computer equipment, and other items from Williams' apartment. (*See id.* at 6-8, Pg. ID 85-87.  *See also* Oct. 24 Tr. at 29, Pg. ID 118.)

54. Veldhuis was not present for, and did not play any role in, the execution of the Search Warrant. (*See* Oct. 9 Tr. at 77, Pg. ID 213.)

55. Veldhuis played no role in the decision to seek the Search Warrant nor in the drafting of the Supporting Affidavit. (*See id.* at 80, Pg. ID 216.) Veldhuis' actions were limited to his entry into the apartment, his conversation with Williams, his brief inspection of the conditions of the apartment, and his communications with Cassette and Flynn.

## **ANALYSIS**

Williams now moves to suppress all of the evidence seized from his apartment and to dismiss the Indictment.  Williams argues that the Search Warrant was invalid for two reasons: (1) the Supporting Affidavit contained information gathered during Veldhuis' unlawful warrantless entry into his apartment, and (2)

10

the Supporting Affidavit did not establish probable cause to believe that he had committed a crime. Williams insists that the Court must therefore suppress the evidence that the police unlawfully seized pursuant to the Search Warrant. For the reasons explained below, the Court declines to suppress the evidence.

### 1. The Legality of Veldhuis' Warrantless Entry into Williams' Apartment is a Very Close Question

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. Amend. IV. The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court*, 407 U.S. 297, 313 (1972). Thus, "a search carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.'" *Coolidge v. New Hampshire*, 403 U.S. 443, 474-75 (1971).

The Sixth Circuit has recognized that an exigency justifying a warrantless entry into a home may exist "in cases involving community caretaking [by police] such as when a warrantless home-entry is the only way for the police to put an immediate stop to an ongoing nuisance." *United States v. Washington*, 573 F.3d 279, 288 (6th Cir. 2009) (citing *United States v. Rohrig,* 98 F.3d 1506 (6th Cir. 1996)). The Sixth Circuit applies three factors to determine whether a warrantless

11

entry by an officer performing a caretaking function is permitted under this exception: "(1) whether immediate government action was required, (2) whether the governmental interest was sufficiently compelling to justify a warrantless intrusion, and (3) whether the citizen's expectation of privacy was diminished in some way." *Rohrig*, 98 F.3d at 1521 (applying factors and upholding police's warrantless entry to address an ongoing nuisance caused by loud music). In this case, it is a very close question whether Veldhuis' warrantless entry into Williams' apartment was justified under the community caretaker/exigency exception to the warrant requirement recognized by the Sixth Circuit.[4]

The government makes a reasonably persuasive case that Veldhuis' entry was justified under this exception. First, the government highlights the evidence

---

[4]The community caretaker exception to the warrant requirement and the exigent circumstances exception are separate and distinct from one another. The community caretaker exception, recognized in *Cady v. Dombrowski*, 413 U.S. 433 (1973), authorizes warrantless police actions taken "not for any criminal law enforcement purpose but rather to protect members of the public." *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 553 (7th Cir. 2014). The "primary focus" of this exception is on "the purpose of police action rather than on its urgency." *Id.* In contrast, the exigent circumstances exception, as its name suggests, focuses on the need for immediate police action. *See, e.g.*, *Michigan v. Tyler*, 436 U.S. 499, 509 (1978). The exception described by the Sixth Circuit in *Washington* and applied by the Sixth Circuit in *Rohrig* is neither a traditional exigent circumstances exception nor a standard community caretaker exception. It has been aptly labeled "a modified exigent circumstances test, with perhaps a lower threshold for exigency if the officer is acting in a community caretaking role." *Ray v. Township of Warren*, 626 F.3d 170, 175 (3d Cir. 2010) (describing test applied by the Sixth Circuit in *Rohrig*). Throughout this Opinion and Order, the Court, therefore, refers to the exception as the "community caretaker/exigency exception."

that Veldhuis was performing a community caretaking function, rather than a traditional law enforcement function, when he entered Williams' apartment. As the government properly notes, Veldhuis testified that he entered Williams apartment in order to address (1) what he perceived as a medical emergency and (2) a severe hoarding situation that could have posed a threat to both Williams and his neighbors. Veldhuis also insisted that he had no need to enter the apartment to search for evidence of a crime because he believed that Ferrell's observations of suspected child pornography, as reported to him, would have been sufficient to support a request for a warrant to search the apartment. The Court finds all of this testimony to have been credible, and the Court shares the government's view that this testimony supports a finding that Veldhuis was primarily performing a community caretaking function.

Second, the government points to a legitimate need to take immediate action. The government fairly notes that the hoarding situation that Veldhuis encountered posed a real threat to the Initial Responders, to Williams, and to the other residents of Williams' apartment building. Indeed, the press has reported on several fires and other public health risks caused by hoarding and has noted that the threat is especially serious when the hoarding occurs in an apartment building with multiple residents. *See, e.g, Firefighters Respond to Another House Fire Involving Hoarding in Lansing*, LANSING ST. J., Mar. 27, 2014, *available at* 2014 WLNR

8414362 (reporting "third house fire in a month involving hoarding" in Lansing area); *Living and Dying in Chaos and Clutter*, DETROIT FREE PRESS, Nov. 29, 2010, *available at* 2010 WLNR 23701153 (noting that hoarded materials can become "a fuel source" for fire); *Task Forces Offer Hoarders a Way to Dig Out*, NEW YORK TIMES, May 27, 2013, at A1 (hoarding creates contagion risk for viruses, "particularly when a home shares walls with neighbors in an apartment building or a condo complex"). Veldhuis did have some reason to enter the apartment in order to make a prompt assessment of the hoarding threat and, in addition, to assess whether Williams could safely remain in the apartment if the Initial Responders decided not to transport him to the hospital.

Third, the government reasonably argues that given the potentially serious threat posed by Williams' hoarding, Veldhuis' entry into Williams' apartment served an important governmental interest. Indeed, the government plainly has a strong interest in protecting residents of apartment buildings from the fire hazards and contagion risks created by severe hoarding conditions, such as those found in Williams' apartment. Likewise, the government has a strong interest in ensuring that vulnerable elderly citizens like Williams are not living in squalor and in unsafe quarters. Veldhuis attempted to further these interests by entering Williams' apartment to inspect the living conditions.

14

Finally, the government properly insists that Williams had a substantially diminished expectation of privacy in those areas of his apartment that were in plain view of the Initial Responders – including the areas in which he displayed his sexually explicit photographs of young girls.  While a person normally has a high expectation of privacy in his dwelling, *see, e.g. Kyllo v. United States*, 533 U.S. 27, 37 (2001), Williams sacrificed much of that expectation when he invited the Initial Responders into his apartment to tend to his immediate medical needs.  As the Sixth Circuit has explained, a homeowner who seeks aid "from an emergency team" including paramedics, "clearly" has a "diminished" expectation of privacy in those areas of his home that the team must enter in order to render assistance.  *Thacker v. City of Columbus*, 328 F.3d 244, 254-55 (6th Cir. 2003).  Other federal and state courts have similarly concluded that a person who seeks emergency assistance has a reduced expectation of privacy with respect to items in plain view of the responders as they are performing their emergency functions.  *See, e.g., United States v. Telfair*, 507 Fed. App'x. 164, 175 n.15 (3d Cir. 2012) (when a person summons emergency aid to his home "and one of the individual's possessions in plain view contains obvious evidence of [a] crime, under the plain view doctrine [he] has a reduced expectation of privacy in that possession"); *State v. Flippo*, 575 S.E.2d 170, 182 (W. Va. 2002) ("a person who summons the police for help … relinquishes his/her constitutionally protected right to privacy, to the

15

extent necessary for the police to effectively respond to facts presented by the call for help"); *State v. Pearson-Anderson*, 41 P.3d 275, 279 (Idaho Ct. App. 2001) (recognizing that a person who summons emergency assistance diminishes his reasonable expectation of privacy in his home).[5]  When Williams invited the Initial Responders into his apartment in order to render medical assistance, he substantially relinquished any expectation of privacy he may have had in items that the responders could see in plain view as they rendered aid.

Williams argues that while his invitation to the Initial Responders may have diminished his expectation of privacy in his living room – where he was positioned when he authorized them to break the chain on his door and enter his apartment – he did not relinquish an expectation of privacy *in his bedroom* – where Ferrell first discovered the child pornography.  However, Williams' invitation to the Initial Responders diminished his expectation of privacy in those areas that Williams knew or should have known the responders would need to enter in order to assess and treat him, and Williams' bedroom was just such an area.  Indeed, when Williams invited the Initial Responders into his unit, Williams knew or should have known that (1) the Initial Responders would need to know what medications

---

[5]  To be sure, a person does not entirely forfeit his expectation of privacy in his dwelling by summoning emergency aid or calling 911, and the police may not justify a broad warrantless search of a residence on the ground that the occupant sought emergency aid.  *See Thompson v. Louisiana*, 469 U.S. 17 (1984).  But by summoning emergency aid, a person authorizes police to observe and seize items in plain view.  *See id.* at 22.

he was taking; (2) he was unable to identify his medications from memory; (3) the medications were located in the bedroom; (4) he might be physically unable to retrieve the medications from his bedroom due to his injuries; and (5) the Initial Responders might therefore need to enter the bedroom to locate and identify the medications. Thus, when Williams sought emergency assistance, he relinquished his expectation of privacy in those portions of his bedroom in plain view.

Under all of these circumstances, the government makes a reasonably strong case that Veldhuis' warrantless entry into Williams' apartment was justified by the community caretaker/exigency exception to the warrant requirement.

Nonetheless, several considerations weigh *against* a finding that the community caretaker/exigency exception applies here. First, although the *Rohrig* court upheld an officer's warrantless entry into a private home under that exception, the Sixth Circuit has since expressed "doubt that community caretaking will generally justify warrantless entries into private homes." *U.S. v. Williams*, 354 F.3d 497, 508 (6th Cir. 2003). In fact, this Court has not found any post-*Rohrig* Sixth Circuit cases upholding a warrantless entry into a private residence based upon community caretaking considerations. Moreover, other courts of appeals have held that community caretaking considerations may justify warrantless searches of automobiles, but not warrantless searches of private residences. *See, e.g., Sutterfield*, 751 F.3d at 556 (7th Cir. 2014) (collecting cases); *but see United*

17

*States v. Quezada*, 448 F.3d 1005, 1007-08 (8th Cir. 2006) (relying on community caretaker/exigency exception to justify warrantless search of home).

Second, the Supreme Court has explained that community caretaking functions justify warrantless searches only when the functions are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady*, 413 U.S. at 441. Likewise, the Sixth Circuit has cautioned that "[t]he community caretaking function of the police cannot apply where … there is significant suspicion of criminal activity." *Williams*, 354 F.3d at 508. In this case, before Veldhuis entered Williams' apartment, he suspected that Williams may have possessed child pornography. Thus, even though Veldhuis entered the apartment primarily to perform a community caretaking function, it is at least arguable that Veldhuis' entry was not "totally divorced" from the detection or investigation of criminal activity and that the community caretaker/exigency exception would not apply.[6]

---

[6] Veldhuis candidly admits that he knew about the suspected child pornography before entering Williams' apartment and that the pornography was a "secondary reason" for his presence at the apartment complex. As noted above, Veldhuis nonetheless insists, in testimony the Court finds credible, that he entered Williams' apartment to address what he perceived to be the ongoing "emergency" posed by the hoarding and by Williams' health condition. (Oct. 9 Tr. at 81, Pg. ID 217. *See also* Oct. 24 Tr. at 13, Pg. ID 102.) There is thus a legitimate argument that while Veldhuis' *presence* at the apartment complex was not "totally divorced" from law enforcement activities, his actual *entry* into the apartment was.

Third, there is reason to question the true immediacy of Veldhuis' need to enter Williams' apartment without a warrant.  By the time Veldhuis arrived, the Initial Responders were already tending to Williams' medical needs, and they did not indicate to Veldhuis in any way that they needed his help in assessing or treating Williams.  And while Williams' hoarding may have posed a risk to both Williams and his neighbors, one could fairly ask whether that risk stood a realistic chance of quickly ripening into an actual harm.  For instance, Williams' hoarding seems unlike a bomb making operation or a "meth lab" that could easily go up in flames.  *See, e.g.*, *United States v. Atchley*, 474 F.3d 840, 850-51 (6th Cir. 2007) (dangers associated with suspected methamphetamine lab justified warrantless entry).

For all of the reasons explained above, it is a very close question in this case whether the community caretaker/exigency exception justified Veldhuis' warrantless entry into Williams' apartment.  The fact that Williams invited the Initial Responders to enter into his apartment perhaps tips the balance in favor applying the exception and upholding the constitutionality of Veldhuis' entry.[7] That invitation – and the concomitant substantial reduction in Williams'

---

[7]  The Court does not conclude that Williams' invitation to the Initial Responders rose to the level of consent for Veldhuis to conduct a search of Williams' apartment for evidence of suspected child pornography.  Rather than establishing Williams' formal consent to a law enforcement search, the invitation evidences Williams' substantially diminished expectation of privacy.

19

expectation of privacy in the areas of his apartment in plain view – sharply distinguishes this case from those in which the Sixth Circuit and other courts have declined to apply the community caretaker/exigency exception to warrantless entries of dwellings.  Ultimately, however, the Court need not decide whether the community caretaker/exigency exception justified Veldhuis' entry into the apartment.  As explained below, for the purposes of resolving Williams' Motion, it is sufficient to conclude that Veldhuis' warrantless entry, if not constitutional, was at least very close to the line of constitutionality.

**2.  Suppression of the Evidence Seized Pursuant to the Search Warrant is Not Warranted**

Even if Veldhuis' warrantless entry into Williams' apartment violated the Fourth Amendment, Williams would not be entitled to suppression of the evidence seized pursuant to the Search Warrant.  The Supreme Court has recently (and repeatedly) stressed that "suppression is *not* an automatic consequence of a Fourth Amendment violation."  *Herring v. United States*, 555 U.S. 135, 137 (2009) (emphasis added).  Suppression is warranted only where "exclusion would result in appreciable deterrence" of police misconduct and "the benefits of exclusion outweigh its costs."  *Davis v. United States*, 131 S. Ct. 2419, 2436 (2011).  And the Sixth Circuit has held that under the exact circumstances present here – where an affidavit supporting a search warrant is tainted by evidence obtained during an unlawful warrantless entry – suppression is not appropriate if the initial warrantless

20

entry was close to the line of constitutionality and if the officers who executed the warrant acted in good faith. *See United States v. McClain*, 444 F.3d 556 (6th Cir. 2006). This Court declines to suppress the evidence seized from Williams' apartment because Veldhuis' warrantless entry into the apartment was close to the line of constitutionality (if not constitutional) and because the officers who obtained and executed the Search Warrant acted in the utmost good faith.

The Sixth Circuit's decision in *McClain* controls here. In *McClain*, police officers responded to a 911 call reporting a possible break-in at a house that the caller believed to be vacant. After arriving at the house, the police officers observed that the front door was slightly ajar and the interior lights were on. The officers – acting without a warrant – entered the house to search for potential intruders. The officers did not find any intruders inside the house, but they did discover marijuana-growing paraphernalia. One of the officers reported the paraphernalia to his supervisor, who had not participated in the warrantless entry. The supervisor then contacted a third officer ("Officer Murphy"), who also had not participated in the warrantless entry. Officer Murphy prepared a search warrant affidavit based, in part, on the responding officers' observations from inside the house. In the affidavit, Officer Murphy described the circumstances surrounding the initial warrantless search of the house. Officer Murphy presented the affidavit to a magistrate, and the judicial officer issued the requested search warrant. A

different team of officers executed the warrant, and they seized marijuana plants and growing equipment from the house. After the owners of the house were charged with several drug-related offenses, they moved to suppress the evidence seized from the house. The district court held that the officers' initial entry into the home "violated the Fourth Amendment, necessitating the suppression of all evidence derivative of that warrantless search." *Id.* at 561.

The Sixth Circuit reversed. The Sixth Circuit first observed that under the good-faith exception to the exclusionary rule announced in *United States v. Leon*, 468 U.S. 897 (1984), exclusion is not appropriate where police officers act in reasonable reliance on a search warrant later determined to be defective. *See McClain*, 444 F.3d at 564-65. The Sixth Circuit held that the *Leon* good-faith exception was applicable *even though the officers' initial entry into the house violated the Fourth Amendment*. The Sixth Circuit applied the good-faith exception because the officers who sought and executed the search warrants "acted in good faith[] and … the facts surrounding the initial warrantless search were close enough to the line of validity to make the executing officers' belief in the validity of the search warrants objectively reasonable." *Id.* at 566.

The Sixth Circuit emphasized that the executing officers had no reason to doubt the validity of the search warrant because, among other things, a neutral and detached magistrate issued the warrant in reliance on an affidavit that "fully

22

disclosed … the circumstances surrounding the initial warrantless search." *Id.* The Sixth Circuit also emphasized that "the officers who sought and executed the search warrant[] were not the same officers who performed the initial warrantless search." *Id.* The Sixth Circuit further highlighted that even though the initial warrantless entry was unconstitutional, it was a close call, and the officers who initially entered the home were not "objectively unreasonable" in concluding that their entry was justified. *Id.*

This case is exactly like *McClain*. As discussed above, even if Veldhuis' entry into Williams' apartment violated the Fourth Amendment, it was an extremely close call, and Veldhuis' conclusion that he could lawfully enter the apartment was not unreasonable. Likewise, Detective Flynn and the officers executing the Search Warrant acted in the utmost good faith. In the Supporting Affidavit, Flynn clearly disclosed to the magistrate that Veldhuis' observations were made during a warrantless entry into Williams' apartment, and the magistrate did not raise any objections to, nor questions concerning, that warrantless entry. Under these circumstances, Flynn had no reason to question the validity of Veldhuis' entry into the apartment nor the propriety of including Veldhuis' observations in the Supporting Affidavit.[8] Moreover, Flynn sent the Supporting

---

[8]  In *United States v. Thomas*, 757 F.2d 1359 (2d Cir. 1985), the Second Circuit applied the good faith exception under analogous circumstances. In *Thomas*, an affidavit submitted in support of a search warrant contained information gathered

Affidavit to the Wayne County Prosecutor's Office for approval before he presented it to the magistrate, and the prosecutor did not voice any concerns about Veldhuis' warrantless entry.  While the lack of an objection from the prosecutor certainly does not establish the validity of the Supporting Affidavit, it does support this Court's finding that Flynn acted in complete good faith.  Finally, as in *McClain*, the officers (including Flynn) who executed the Search Warrant did not participate in the initial warrantless entry of Williams' apartment, and, moreover, they had no reason to question the validity of the Search Warrant that had been duly issued by a judicial officer.  As explained below, the Search Warrant was

---

during an earlier search that, according to the Second Circuit, violated the Fourth Amendment.  The Second Circuit nonetheless held that evidence seized pursuant to the warrant should not be suppressed.  The court stressed that the circumstances of the prior search had been disclosed to the magistrate, who nonetheless issued the warrant.  Accordingly, the police had a good faith basis to believe that the evidence obtained during the prior search could be used to establish probable cause for the warrant, and the *Leon* good-faith exception applied:

> Th[e] magistrate determined that probable cause to search existed, and issued a search warrant.  There is nothing more the officer could have or should have done under these circumstances to be sure his search would be legal.  *The magistrate, whose duty it is to interpret the law, determined that the [evidence obtained during the prior unlawful search] could form the basis for probable cause; it was reasonable for the officer to rely on this determination.*  The *Leon* Court announced a "good faith" exception to the exclusionary rule, and we find that the exception applies to this case.

*Id.* at 1368 (emphasis added).

amply supported by probable cause.  Under these circumstances, *McClain* compels the conclusion that exclusion is not an appropriate remedy here.

Two Supreme Court cases decided after *McClain* reinforce this Court's holding that suppression is not appropriate here given the good faith of all of the officers involved.  In *Herring*, *supra*, the Supreme Court stated that "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price" of "letting guilty and possibly dangerous defendants go free."  *Herring*, 555 U.S. at 141, 144 (evidence should not be suppressed where officer who stopped suspect did not act deliberately, recklessly, or grossly negligently).  Similarly, in *Davis*, *supra*, the Supreme Court explained that exclusion is not appropriate "when the police act with an objectively reasonable good-faith belief that their conduct is lawful … or when their conduct involves only simple, isolated negligence."  *Id.* at 2427-28 (internal citations and punctuation omitted) (declining to apply exclusionary rule to evidence seized pursuant to search conducted in compliance with binding precedent that was later overturned).

*Herring* and *Davis* underscore that police culpability is an essential prerequisite to suppression.  There is simply no such culpability here.  Veldhuis acted reasonably and in good faith when he entered the apartment out of his "overriding concern" for safety.  Likewise, Flynn had an objectively reasonable,

good-faith belief in the validity of the Search Warrant. Indeed, having disclosed the circumstances of Veldhuis' warrantless entry to a neutral magistrate, there was "nothing more [Flynn] could have or should have done … to be sure his search would be legal." *Thomas*, 757 F.2d at 1368. Where, as here, the police did not act culpably, suppression is not warranted. *See Davis*, 131 S. Ct. at 2428 (citing *Leon*, 468 U.S. at 919).[9]

### 3. Sufficiency of the Supporting Affidavit

The *Leon* good-faith exception does not apply where the affidavit submitted in support of a search warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923. Here, Williams contends that the descriptions of Williams' photographs in the Supporting Affidavit were patently insufficient to establish probable cause that the photographs constituted child pornography as defined under Michigan law, and he thus insists that the good-faith exception does not apply. This Court disagrees.

Michigan law prohibits the possession of "child sexually abusive material," which is defined as a depiction of a person who is less than 18 years of age

---

[9] The government argues against suppression on two additional grounds: (1) that Veldhuis' initial, warrantless entry into Williams' apartment was justified under the emergency aid exception to the warrant requirement, *see, e.g.*, *Michigan v. Fisher*, 558 U.S. 45 (2009), and (2) that even if Veldhuis' initial entry was unlawful, the seizure was valid pursuant to the independent source doctrine. The Court need not address these arguments because it finds suppression unwarranted for the reasons discussed above.

engaged in "listed sexual acts."  M.C.L. §§ 750.145c(1)(o), 750.145c(4).  "Listed sexual acts" include "sexual intercourse, erotic fondling, sadomasochistic abuse, masturbation, passive sexual involvement, sexual excitement, or erotic nudity." M.C.L. § 750.145c(1)(i).  "Erotic nudity" is "the lascivious exhibition of the genital, public, or rectal area."  M.C.L. § 750.145c(1)(h).  And "lascivious" is defined as "wanton, lewd, and lustful and tending to produce voluptuous or lewd emotions." *Id.*

The Supporting Affidavit stated that Ferrell "observed numerous pictures of young children[,] specifically girls in the nude" inside Williams' apartment.  The Supporting Affidavit further noted that Veldhuis "observed numerous pictures framed and unframed of nude female children."  Williams contends that these statements do not constitute probable cause to believe that the photographs depicted "erotic nudity" or any other listed sexual act.  Williams argues that Ferrell's and Veldhuis' observations could have described innocuous "bath time" pictures that parents occasionally take of their children, rather than illegal child pornography.

When read in its entirety, however, the Supporting Affidavit established probable cause to believe that the photographs depicted "erotic nudity" and were not simply innocent "bath time" images. *See, e.g.*, *United States v. Plemmons*, 336 F.2d 731, 734 (affidavit supporting a search warrant "must be read as a whole" and

27

statements therein must be read in context); *Tolbert v. United States*, 112 Fed. App'x 440, 443 (6th Cir. 2004) (same). Importantly, the Supporting Affidavit stated that Veldhuis "believ[ed] th[e photographs] to be child pornography." While Veldhuis' description certainly did not prove that the photographs were, in fact, "erotic nudity," his use of the term "child pornography" (in conjunction with his description of the naked young girls) did provide a basis for the magistrate to find probable cause that the photographs were *not* innocent bathing snapshots. Moreover, the Supporting Affidavit indicated that Veldhuis also observed "[n]umerous Barbie dolls undressed … in sexual positions" as well as children's underwear in Williams' bedroom. These additional facts provide important context for Ferrell's and Veldhuis' descriptions of the photographs in Williams' apartment.

Furthermore, the description of the photographs in the Supporting Affidavit is not all that different from photographs deemed by the Michigan Court of Appeals to constitute "erotic nudity" under Michigan law. *See People v. Holbrook*, No. 298869, 2011 WL 5064266 (Mich. Ct. App. Oct. 25, 2011). The defendant-appellant in *Holbrook* challenged his conviction for possession of child sexually abusive material on the ground that the photographs he possessed did not display erotic nudity. The *Holbrook* court described the photographs as depicting (1) a girl "sitting naked on a chair … covering herself up, with her arms crossed," and her

"genitals and breasts … visible" and (2) a girl "standing naked in a shower." *Id.* at *5. The *Holbrook* court found "no reason to upset the jury's determination that the pictures constituted" erotic nudity. *Id.*

In light of *Holbrook*, a reasonable argument could be made that the statements in the Supporting Affidavit regarding "numerous pictures of … girls in the nude" and "nude female children" would be sufficient to establish probable cause to believe that Williams possessed child pornography. At a minimum, these statements would be sufficient to allow Flynn to reasonably conclude that probable cause had been established. Indeed, if the jury in *Holbrook* could reasonably find beyond a reasonable doubt that photographs of a girl "sitting naked on a chair" and "standing naked in a shower" depicted "erotic nudity," then Flynn could reasonably rely on the magistrate's determination that the statements in the Supporting Affidavit established probable cause to believe that Williams' photos depicted "erotic nudity."

Under these circumstances*,* the Court has little difficulty concluding that the statements in the Supporting Affidavit, when read in context and in their entirety, established probable cause to support the issuance of the Search Warrant. And even if the Court were to conclude that the Supporting Affidavit fell short of establishing probable cause, the deficiency would not be so great as to preclude application of the *Leon* good-faith exception. *See Leon*, 468 U.S. at 923 (good-

29

faith exception does not apply when a warrant is "so facially deficient … that the executing officers cannot reasonably presume it to be valid").

## **CONCLUSION**

For all the reasons stated in this Opinion and Order, **IT IS HEREBY ORDERED** that Williams' Motion (ECF #17) is **DENIED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  February 19, 2015

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on February 19, 2015, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113